**Elizabeth PAOLUCCI, Petitioner**

**v.**

UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW,
Respondent.

Commonwealth Court of Pennsylvania.

Argued March 11, 2015.
Decided June 19, 2015.

Howard A. Rosen, Philadelphia, for petitioner.

Maribeth Wilt–Seibert, Assistant Counsel, Harrisburg, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, and RENÉE COHN JUBELIRER, Judge, and MARY HANNAH LEAVITT, Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge MARY HANNAH LEAVITT.

Elizabeth Paolucci (Claimant) petitions for review of an adjudication of the Unemployment Compensation Board of Review (Board) denying her claim for benefits for the stated reason that she committed willful misconduct, which rendered her ineligible under Section 402(e) of the Unemployment Compensation Law.[1] In this case of

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e). It provides, in relevant part, that "[a]n employe shall be ineligible for compensation for any week … [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work[.]" 43 P.S. § 802(e).

first impression, we consider what happens when a disabled employee's assertion of her rights under the Workers' Compensation Act[2] is construed by her employer as violating the standards of behavior it can reasonably expect of its employees. We conclude that, where an employee is on workers' compensation disability, the determination of whether her employer's expectations for her behavior are reasonable is governed by the standards of the Workers' Compensation Act. The Board's findings of fact do not support its legal conclusion that Claimant violated a reasonable expectation of Employer and, accordingly, we reverse.

## Background

Claimant worked for Wal–Mart Associates (Employer) from December 7, 2007, through August 4, 2011, most recently as an inventory management specialist supervisor. On July 17, 2010, she sustained a brain concussion when shelving collapsed on her head. Employer filed a Notice of Compensable Payable (NCP) with the Bureau of Workers' Compensation that described Claimant's work injury as a concussion, for which it was paying total disability in the amount of $422.50 per week. Certified Record Item No. 10, Claimant Exhibit # 1 (C.R. No. ——, # ——). In November of 2010, Claimant saw her two treating physicians; neither cleared her to return to work. C.R. No. 5, # 6; C.R. No. 10, # 2.[3] In December of 2010, Claimant attended an independent medical examination (IME) at the request of Employer. The IME physician opined that Claimant was recovered from

her concussion and could return to work to her pre-injury job with no restrictions. Upon receiving the IME report in January 2011, Employer's Store Manager, Henry Wolfe, called Claimant about several jobs. Claimant's attorney responded to those calls. Counsel reminded Wolfe that he represented Claimant with respect to her workers' compensation benefits and that he had previously advised Wolfe that communications to Claimant should be made to her counsel. Notes of Testimony, 3/23/2012, at 13 (N.T. ——). Claimant's attorney also advised Wolfe that Claimant disputed the IME report that she was capable of working without restrictions. *Id.* at 14. Employer then instituted a workers' compensation proceeding to terminate, modify or suspend Claimant's workers' compensation disability benefits.

On July 11, 2011, in the course of the workers' compensation proceeding, Employer deposed Claimant. In that deposition, Claimant testified that neither of her two treating physicians had released her to return to work and that they were still evaluating her condition.[4] She also testified that she was not capable of returning to work as an inventory management supervisor because the job required bending over to pick up large heavy boxes and climbing ladders. Her concussion had left her with impaired focus and poor balance. Further, Claimant's pre-injury job was very fast-paced and stressful, which she could not handle, given her limitations. However, she volunteered her personal belief that she could do the job of a food

---

**2.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

**3.** The UC Service Center's oral interview stated as follows:

[M]y doctors said I needed to rest and heal for a year or two before all the symptoms would clear up.... The last time I went

was November 2010, and they said time would heal the symptoms from the injury. C.R. No. 5, # 6.

**4.** One page of Claimant's deposition transcript was introduced as evidence at the first unemployment compensation hearing. C.R. No. 10, # 2. The questions were those of Employer's counsel. N.T., 12/23/2011, at 7.

inspector, a less stressful and slower-paced position. She had previously held this position with Employer. Employer did not respond to Claimant's statement that she could do a light duty job with a job offer, and Claimant continued to collect total disability compensation in accordance with the NCP.

On August 4, 2011, Employer discharged Claimant without written or oral explanation. She did not learn of her discharge until Merrill Lynch contacted her regarding administration of her 401(k) plan. On September 22, 2011, the parties settled their workers' compensation dispute. On October 9, 2011, Claimant applied for unemployment compensation benefits. In response, Employer's representative, TALX, advised the UC Service Center in its written questionnaire that Claimant had "voluntarily quit" her employment. C.R. No. 4, #10, ¶5. TALX also stated on the questionnaire that Claimant did not advise Employer of "his/her health limitations." *Id* at ¶7. TALX left blank the question "Did you offer other work to the Claimant?" *Id.* at ¶8. It also left blank the directive to "explain why the work [within the claimant's limitations] was not offered to the claimant." *Id.* TALX responded "no" to the question "Did the claimant refuse the offer of other work?" *Id.* at ¶9.

The UC Service Center denied benefits for the stated reason that Claimant "has not been released to return to work by her doctor" and, thus, was not available for work. C.R. No. 6, Finding of Fact No. 5. Claimant appealed.

## First Referee Hearing

A hearing on Claimant's appeal took place on December 23, 2011. Although TALX had received notice of the hearing, it did not appear. Nor did it contact the Referee that it would not attend the hearing. Claimant appeared and presented evidence.

Claimant presented evidence that she was available for work as of the date of her October 9, 2011, application for unemployment compensation. First, she presented four pages from her workers' compensation deposition in which she stated her belief that she could do the job of a food inspector. That deposition took place on July 11, 2011, well before her application for unemployment compensation. Second, she presented a note from her neurologist dated December 21, 2011, stating that Claimant could return to work. On December 28, 2011, the Referee issued a decision with the following Findings of Fact:

1. The Claimant worked fulltime as Inventory Control Supervisor for Wal-Mart Associates from December 7, 2007 through August 4, 2011 at a final rate of $14.55 per hour.

2. On July 17, 2010, the Claimant suffered a work related head injury resulting in brain concussions.

3. As a result of the injury, the Claimant could not carry out her regular duties.

4. The Claimant remained in doctor's care until July 11, 2011.

5. From July 11, 2011, the Claimant was able and available for some kind of work.

C.R. No. 11 at 1. The Referee awarded Claimant unemployment compensation as of October 15, 2011.

On January 6, 2012, TALX appealed to the Board and requested a new hearing. It explained that its witness, Henry Wolfe, became ill with pneumonia and could not participate in the Referee's hearing. The Board ordered a remand to the Referee, following which the Board would determine whether Employer had good cause for not attending the hearing on December 23, 2011, and, if so, address the merits of the case.

### Second Referee Hearing

At the remand hearing, Employer presented evidence that Claimant's supervisor, Henry Wolfe, had been medically incapacitated at the time of the December hearing. Claimant's counsel argued that Employer did not present good cause, noting that TALX should have contacted the Referee and requested a continuance. It did neither. Further, TALX offered no evidence that only Wolfe could testify about Claimant's separation from employment.

The remainder of the remand hearing concerned Claimant's eligibility for unemployment compensation. The parties stipulated that Claimant did not voluntarily quit, as Employer had stated in its questionnaire. Rather, Employer discharged Claimant on August 4, 2011, while she was collecting total disability workers' compensation benefits.

On the merits, Wolfe testified that Employer terminated Claimant because she did not return to work from "her Workers' Comp leave of absence" after she was cleared to do so by Employer's IME physician in December 2010. N.T., 3/23/12, at 5.[5] Wolfe then stated that "we had made several attempts to contact [Claimant] to let her know that we had positions available for her and they were intercepted by her attorney." N.T., 3/23/2012, at 5–6. Wolfe also stated that Claimant did not return Employer's

> phone calls or any of our letters [letting her] know that we had positions available for her. And due to that reason, we have no—*we waited several months after that occurrence before we actually separated her.*

*Id.* at 6 (emphasis added). Claimant's Counsel asked Wolfe whether Employer had offered Claimant any employment *after* July 11, 2011, but he did not answer the question. *Id.* at 9–10. Instead, Wolfe demurred, stating that Claimant "could have" returned to work because "[s]he was still employed." *Id.* at 10. Finally, Wolfe acknowledged that Employer "never received any documentation from [Claimant's] treating physician" that she could work in any capacity. N.T. 3/23/12 at 14.

Claimant confirmed her workers' compensation deposition testimony. In that testimony she explained that she did not agree with the IME report that she was capable of returning to her prior position in December of 2010; indeed, she did not believe she could do any job at that time. By the time of Employer's deposition of her on July 11, 2011, she still did not believe she could do her pre-injury job as inventory control specialist. However, in response to Employer's question about whether she could return to any kind of employment, she answered that it was possible that she could do the job of a food inspector.

The Board held, first, that Employer had good cause not to appear at the first Referee hearing.[6] The Board then addressed the merits of Employer's appeal.

The Board adopted the first five Findings of Fact in the Referee's Decision of December 28, 2011, and added eight new findings:

6. The claimant could have worked in a light duty position for the employer as of July 11, 2011.

7. The employer did send the claimant letters and did make phone calls

---

5. Wolfe stated: "[Claimant] is no longer employed with us is (sic) because she didn't return from her Workers' Comp leave of absence." N.T. 3/23/13 at 5. Workers' compensation disability leave ends by adjudication or settlement. Claimant's workers' compensa-

tion disability leave ended by settlement on September 22, 2011. At that point, she had already been discharged.

6. Claimant did not appeal that ruling.

that were not returned when the employer's physician indicated that the claimant could work.

8. Then the [claimant's] attorney told the employer to not directly contact the claimant.

9. The claimant entered into a workers' compensation agreement on September 22, 2011.

10. The claimant did not voluntarily resign as part of the agreement.

11. The claimant had already been discharged at the time that she entered into the workers' compensation agreement.

12. The claimant was discharged because she failed to contact the employer when she became able to work.

13. The claimant is able and available for work as of July 11, 2011.

Board Adjudication at 1–2, Findings of Fact No. 6–13. Based on its findings of fact, the Board concluded that Claimant was ineligible for unemployment compensation by reason of willful misconduct. It reasoned as follows:

The claimant never made the employer aware that she could return to work. Further, the claimant did not respond to the employer's offer of work. Finally, the claimant's attorney told the employer to no longer contact the claimant.

Board Adjudication at 3. The Board did not cite a work rule or policy that was violated by Claimant. At oral argument before this Court, the Board explained that Claimant's willful misconduct consisted of her failure to meet a reasonable expectation of Employer.

Claimant petitioned for this Court's review.[7] On appeal, she raises two issues.

First, she argues that substantial evidence does not support the Board's finding that Employer offered Claimant a job after July 11, 2011, let alone that Claimant refused to respond to such an offer. Second, Claimant contends that the parties in the workers' compensation proceeding communicated through their attorneys and in no way did Claimant's or her counsel's conduct in the workers' compensation proceeding constitute willful misconduct.

### Willful Misconduct

■ To prove willful misconduct, the employer must show that the employee violated a policy, work rule or reasonable expectation of employer. *Chapman v. Unemployment Compensation Board of Review*, 20 A.3d 603, 606–07 (Pa.Cmwlth. 2011). Employer presented no evidence of a policy or work rule that Claimant allegedly violated. The Board's finding of willful misconduct hinges on whether Employer had a "reasonable expectation" that Claimant violated.

■ A reasonable expectation of employee conduct may vary from case to case, *i.e.*, standards that are expected by one employer may not be the standards of another employer. *Woodson v. Unemployment Compensation Board of Review*, 461 Pa. 439, 336 A.2d 867, 868 (1975). Generally, this Court has categorized conduct that involves "a knowing falsehood or misrepresentation to an employer by an employee concerning an employee's work" as a disregard of an expected standard of behavior. *DeRiggi v. Unemployment Compensation Board of Review*, 856 A.2d 253, 256 (Pa.Cmwlth.2004) (quoting *Groover v. Unemployment Compensation Board of Review*, 134 Pa.Cmwlth. 617, 579 A.2d 1017, 1019 (1990)). Examples of sub-

---

7. Our review determines whether the findings of fact are supported by the evidence, whether constitutional rights were violated, or whether errors of law were committed. *Pollard v.*

*Unemployment Compensation Board of Review*, 798 A.2d 815, 816 n. 3 (Pa.Cmwlth. 2002).

standard behavior include: lying to a supervisor that a telephone call needed to be made due to an emergency and a misrepresentation on an employment application that the employee had a college degree. *See Groover*, 579 A.2d at 1020.

## Analysis

■ In her first issue, Claimant contends that the record does not support the Board's finding of fact that she was offered a job after July 11, 2011, the first date on which the Board found her capable of doing "some kind of work." Wolfe acknowledged that his attempts to contact her about available jobs were made "several months ... before we actually separated her." N.T., 3/23/2012, at 6. We agree with Claimant that there is no evidence that Wolfe attempted to contact Claimant, directly or by her counsel, about a job after July 11, 2011.

The Findings of Fact are not in chronological order. The Board simply added Findings of Fact No. 6–13 to Findings of Fact No. 1–5 made in the Referee's first decision. Claimant argues that there is no substantial evidence that the "letters" and "calls" to Claimant made by Employer took place after July 11, 2011. Claimant is correct. The contacts took place in January of 2011, at a time when Claimant did not believe she could do any job. In sum, we agree with Claimant that Employer did not present any evidence that it ever offered her a job after July 11, 2011.

The Board sidesteps the question of when Employer contacted Claimant about available jobs. It contends that when Claimant "released" herself to work at some kind of job, her absence from work immediately became unexcused. In support, the Board relies upon *Oliver v. Unemployment Compensation Board of Review*, 69 Pa.Cmwlth. 98, 450 A.2d 287 (1982) (holding that the claimant committed willful misconduct when she did not return to work at the end of her leave and did not comply with her employer's notification policy). Here, there is no relevant work rule or policy, assuming one could be adopted with respect to a workers' compensation claimant that did not strictly adhere to the Workers' Compensation Act. Notably, on the questionnaire it submitted to the Bureau of Unemployment Compensation Employer left blank the question of whether it offered her a job within her limitations; further, Employer expressly acknowledged that Claimant did not refuse a job offer. C.R. No. 4, #10, ¶¶ 8, 9.

Nevertheless, the Board argues Claimant did not meet a reasonable expectation of Employer because she did not appear at work on July 12, 2011.[8] The Board explains:

> Similarly here, Claimant was absent after she was released to return to work. Claimant never notified Employer that she planned to return to work. Further,

8. It has been held that an employer can reasonably expect an employee to return to work after medical leave has ended. In *Geesey v. Unemployment Compensation Board of Review*, 33 Pa.Cmwlth. 376, 381 A.2d 1343 (1978), this Court held that an employee committed willful misconduct when he did not tell his employer that he had recovered from surgery for which he had been granted medical leave. We reasoned that an employer has the right to expect an employee "who is on sick leave to report back to work *when cleared to do so by his physician* or at least to notify his employer of his reasons for failing to return." *Id.* at 1344 (emphasis added).

This case is distinguishable from *Geesey*. Wolfe acknowledged that Employer had not received "documentation" from Claimant's "treating physician" that she could work in any capacity. N.T. 3/23/12 at 14. More to the point, Claimant notified Employer at her deposition why she could not return to her pre-injury job. Finally, Claimant's workers' compensation "leave" did not terminate until September 22, 2011, by which time she had been discharged.

Claimant did not respond to Employer's offers of work. Claimant had no good cause for her failure to notify Employer that she could return to work. Therefore, *as Claimant had no good cause for her absence from work after she was released to return to work, her absence rose to the level of willful misconduct.*

Board's Brief at 11 (emphasis added). The Board takes Claimant's statement at her deposition to be a "release" to return to work, which is a novel use of the term. A "release" to return to work is issued by a physician, as was the case in *Oliver,* 69 Pa.Cmwlth. 98, 450 A.2d 287, which the Board cites in its brief.

First, lest there be any doubt, Claimant was "released," not by her physician, but by the physician engaged by Employer, which sought to end Claimant's total disability compensation. The IME physician's release is irrelevant. Claimant disputed that opinion, as was her right under the Workers' Compensation Act.[9] An employer's allegation of full recovery is the first step, not the last, in evaluating whether a claimant is able to work in any capacity and, thus, subject to a termination, suspension or modification of her workers' compensation disability.

Second, Claimant, by her attorney, did respond to the offers of work referenced in Finding of Fact No. 7 that were made in early 2011. Claimant's attorney advised Employer that Claimant disputed the opinion of Employer's IME physician and that she had not yet been cleared by her own physician to work. N.T., 3/23/2012, at 14. Claimant's attorney did not forbid communication between Employer and Claimant. Wolfe acknowledged that Claimant's attorney stated that Employer could communicate with Claimant at any time through counsel. *Id.* at 13. Wolfe explained that he did not communicate with Claimant's attorney about jobs because he did not consider him to be a reliable source of information about Claimant, unlike "our physicians [who] said that she was able to work." *Id.* at 14.[10]

Third, Employer did not offer any evidence about the nature of the jobs Wolfe had in mind in early 2011 when he contacted Claimant (and spoke to her attorney). Employer had two opportunities to make a record on whether it had any light duty positions for Claimant, at any time period. Simply, there is a disconnect between the Board's finding that Claimant could do "some kind of work" on July 11, 2011, and the Board's conclusion that she "did not respond to the employer's offer of work." Board Adjudication at 3.[11] The only jobs

---

9. It is for a Workers' Compensation Judge (WCJ) to determine whether an IME report of an employer's physician is competent and credible. *See, e.g., Inservco Insurance Services v. Workers' Compensation Appeal Board (Purefoey),* 902 A.2d 574, 578 n. 2 (Pa. Cmwlth.2006) (noting that a WCJ, in the role of factfinder, determines the credibility of a medical expert who has offered an IME report that the claimant has recovered).

10. In any case, the communication responsibilities of both employer and claimant are a matter governed by the Workers' Compensation Act. Employer responded to Claimant's "non-response" by seeking to terminate, suspend or modify her disability compensation.

11. The Board did not make a specific factual finding that Claimant "did not respond to the employer's offer of work." Rather, it found as follows:

> The employer did send the claimant letters and did make phone calls that were not returned when the employer's physician indicated that the claimant could work.

Board Adjudication, Finding of Fact No. 7. The "when" of these calls was January of 2011, long before July 11, 2011, the date on which the Board found Claimant was able to work at some kind of job.

ever offered by Employer were made in early 2011 at a time Claimant believed she was not able to work in any capacity. N.T., 12/23/2011, at 7.[12]

The Board is wrong that Claimant had to report to work on July 12, 2011. There is no evidence that Employer contacted Claimant about a light duty job after July 11, 2011, as was its duty under the Workers' Compensation Act.

The Workers' Compensation Act governs the reasonable expectations of an employer with respect to an employee receiving workers' compensation. Section 311.1 of the Act requires a claimant "receiving compensation" to report any wages earned within 30 days of their receipt.[13] 77 P.S. § 631.1(a)(2), (b) (stating that the "employee shall report ... [a]ny wages from such employment or self-employment ... no later than thirty days after such employment or self-employment occurs"). The Act does not require an employee "receiving compensation" to report a recovery from the work injury. However, Section 311.1(d) of the Act allows an employer to request a claimant to report on the state of her physical condition.[14] 77 P.S. § 631.1(d). The Act makes it the employer's duty to seek this information, not the claimant's duty to volunteer it. The employer must also provide the claimant with the necessary forms to provide information requested under Section 311.1(d) of the Act. 34 Pa.Code § 123.501.[15]

Here, there is no evidence that Employer ever requested Claimant to verify her physical condition in accordance with Section 311.1(d) of the Act, 77 P.S. § 631.1(d). Had Employer done so, Claimant would have had 30 days to complete the verification form and return it. 77 P.S. § 631.1(e). Assuming Claimant had been given the form on July 11, 2011, she would

12. However, even this is contrary to the statement on Employer's questionnaire that Claimant did not refuse an offer of work. C.R. No. 4, # 10, ¶ 9.

13. Section 311.1 was added by the Act of June 24, 1996, P.L. 350. It provides, in relevant part:

(a) If an employe ... is receiving compensation under section 306(a) or (b), the employe shall report, in writing, to the insurer the following:

\* \* \*

(2) Any wages from such employment or self-employment.

\* \* \*

(b) The report referred to in clause (a) must be made as soon as possible but no later than thirty days after such employment or self-employment occurs.

77 P.S. § 631.1(a)(2), (b).

14. Section 311.1 also states, in relevant part, as follows:

(d) If an employe ... is receiving compensation under section 306(a) or (b), the insurer may submit a verification form to the employe either by mail or in person. *The form shall request verification* by the employe that the employe's status regarding the entitlement to receive compensation has not changed and a notation of any changes of which the employe is aware at the time the employe completes the verification, including employment, self-employment, wages and *change in physical condition* ....

(e) *The employe is obligated to complete accurately the verification form and return it to the insurer within thirty days of receipt by the employe of the form.* However, the use of the verification form by the insurer and the employe's completion of such form do not relieve the employe of obligations under clauses (a), (b) and (c).

77 P.S. § 631.1(d), (e) (emphasis added).

15. The regulation provides:

An insurer shall notify the employe of the employe's reporting requirements under sections 204 and 311.1(a) and (d) of the act (77 P.S. §§ 71 and 631.1(a) and (d)). In addition, the insurer shall provide the employe with the forms required to fulfill the employe's reporting and verification requirements under section 311.1(d) of the act.

34 Pa.Code § 123.501.

have had until August 10, 2011, to complete it and return it to Employer. However, Claimant was fired on August 4, 2011, well before that deadline.

■ When an employer receives information that the claimant can do some type of work, the employer has the burden of producing evidence that work within the claimant's limitations is actually available for the claimant. *Eidem v. Workers' Compensation Appeal Board (Gnaden–Huetten Memorial Hospital)*, 560 Pa. 439, 746 A.2d 101, 104 (2000). Section 306(b)(2) of the Workers' Compensation Act mandates that if the employer has a job that the claimant is capable of performing, the employer must offer that job to the claimant. 77 P.S. § 512(2).[16] The employer typically does so by providing the claimant with a job referral letter informing her that it has an available position within her capabilities and requesting that she return to work.

*Eidem*, 746 A.2d at 104–05. Employer did not offer Claimant a light duty job; it did not request that she return to work.[17]

Finally, Claimant did not "fail" to tell Employer what she said in her July 11, 2011, deposition. She related this information, under oath, in response to the questions posed by Employer's own attorney.[18] As noted in *Eckman v. Erie Insurance Exchange*, 15 Pa. D. & C. 5th 55, 60 (2010), *affirmed*, 21 A.3d 1203 (Pa.Super.2011), when "a liability insurer retains a lawyer to defend an insured, the insured is considered the lawyer's client." (quoting *Point Pleasant Canoe Rental, Inc. v. Tinicum Township*, 110 F.R.D. 166, 170 (E.D.Pa.1986)).[19]

It was not reasonable for Employer to expect Claimant to convey information already known by, or related to, Employer in her workers' compensation deposition. It was not reasonable for Employer to

**16.** Section 306(b)(2) states, in relevant part, as follows:

> Disability partial in character shall apply if the employe is able to perform his previous work or can, considering the employe's residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employe lives within this Commonwealth.... *If the employer has a specific job vacancy the employe is capable of performing, the employer shall offer such job to the employe.*

77 P.S. § 512(2) (emphasis added).

**17.** The dissent cites *Homony v. Unemployment Compensation Board of Review*, 11 Pa. Cmwlth. 142, 312 A.2d 77 (1973), for the proposition that an employee must maintain contact with the employer during a prolonged medical leave. *Homony* is inapposite.

*Homony* involved an employee who went on sick leave for a medical condition that was not work-related. The employee did not contact the employer at any time during, or after, his sick leave of five months. By contrast, here, Claimant was on workers' compensation disability. Further, Claimant's workers'

compensation disability "leave" did not end until September 22, 2011. Because Claimant and Employer were involved in a workers' compensation proceeding, they were in regular contact.

**18.** The dissent cites *Washington v. Unemployment Compensation Board of Review*, 94 Pa. Cmwlth. 404, 503 A.2d 1055 (1986). In that case, an employee did not return to work after his leave ended. It was a voluntary quit case, and this Court remanded for additional factual findings on the "vital question of whether Claimant informed Employer of his medical condition." *Id.* at 1056. In *Crawford v. Unemployment Compensation Board of Review*, 71 Pa.Cmwlth. 592, 455 A.2d 751 (1983), the claimant violated a work rule by not returning to work, as agreed, when his medical leave expired.

In these cases, this Court noted that notice to an insurance company representative is not notice to an employer. Neither case involved a statement made to the employer's attorney in a workers' compensation deposition.

**19.** The NCP identifies the "Insurer or Third Party Administrator" as CMI of Bentonville, Arkansas. C.R. No. 8, # C1.

expect Claimant to disregard her attorney's instructions that he would be the point person in communications with Employer about her workers' compensation. Finally, it was not reasonable for Employer to expect Claimant to report to work on July 12, 2011, as argued by the Board.[20] Rather, it was Employer's duty to respond to Claimant's statement that she could do some kind of work with a job offer. It did not do so.

For these reasons, we reverse the adjudication of the Board.

## ORDER

AND NOW, this 19th day of June, 2015, the order of the Unemployment Compensation Board of Review, dated May 22, 2012, is REVERSED.

DISSENTING OPINION BY Judge ANNE E. COVEY.

I respectfully dissent. The Majority's statement of the issue on page 1234 of its opinion was not raised either explicitly or implicitly by Claimant. Nor did Claimant raise the two issues the Majority sets forth on page 1238.

Moreover, I strenuously disagree with the Majority dramatically changing well-established precedent and imposing upon employers newly created requirements. Respectfully, this case is **not** one of first impression. The Unemployment Compensation Board of Review's (UCBR) findings of fact are supported by substantial evidence and the UCBR did not err as a matter of law. Each of these matters will be discussed below.

**20.** Employer's stated reason at the hearing for discharging Claimant was that she did not return to work in early 2011, after the IME. N.T. 3/23/11 at 5. Employer stated on the UC questionnaire that Claimant resigned.

### Majority's Statement of the Issue

The Majority states: "In this case of first impression, we consider what happens when a disabled employee's assertion of her rights under the Workers' Compensation [ (WC) ] Act[1] is construed by her employer as violating the standards of behavior it can reasonably expect of its employees." [1] Majority Op. at 1234–35. The Majority's statement of the issue was **not** addressed by the UCBR nor did Claimant raise it in her Petition for Review or Brief.

Claimant's Petition for Review is 1 page and 1 sentence on a second page and consists of 5 paragraphs. Claimant's only objections contained therein are to the UCBR's findings of fact 7 and 12, and conclusion of law that Employer met its burden of establishing that Claimant was discharged for willful misconduct. This Court's scope of review is limited to the "general statement of the objections to the order or other determination; and ... every subsidiary question fairly comprised therein[,]" contained in Claimant's Petition for Review. Pa.R.A.P. 1513(d)(5)-(6).[2] Failure to raise a claim in the petition for review waives the issue, thus we are prohibited from addressing it. *Oliver v. Unemployment Comp. Bd. of Review*, 29 A.3d 95, 98 (Pa.Cmwlth.2011).

Claimant's brief in the Statement of Questions Involved (Statement), lists the issues as follows:

1. Whether the [UCBR's] finding of fact that [Claimant] did not respond to a job offer after July 11, 2011, given her manager's testimony that he was precluded from offering her a job after July

**1.** Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708.

**2.** Pa.R.A.P. 1513(d) was amended December 2, 2014; however, the prior rule was in effect during the applicable period of this appeal.

11, 2011, is supported by substantial evidence?

2. Whether the workers' compensation litigation commenced by [Claimant's] employer, and the parties['] conduct of communicating through their attorneys, rises to the level of willful misconduct to justify a termination of employment?

Claimant Br. at 4.

Claimant's Statement does not correlate to the UCBR's findings of fact. As listed on pages 1236, 1237 and 1238 of the Majority Opinion, the UCBR made **no** finding concerning Employer's job offer after July 11, 2011, nor did it find that Claimant's manager testified he was precluded from offering Claimant a job after July 11, 2011 or that the parties had a conduct of communicating through their attorneys. "[The UCBR] is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected. The findings need only be sufficient to enable the Court to determine the questions and ensure the conclusions follow from the facts." *Balshy v. Pa. State Police*, 988 A.2d 813, 835 (Pa.Cmwlth.2010), (citation omitted).

The findings of fact which include the July 11, 2011 date all relate to Claimant's ability and availability to return to work.[3] The only two findings that Claimant challenges as not being supported by substantial evidence are findings 7 and 12. Those

findings state: "[E]mployer did send [C]laimant letters and did make phone calls that were not returned when [E]mployer's physician indicated that [C]laimant could work." UCBR Dec. at 1, Finding of Fact (FOF) 7. The UCBR also found that "[C]laimant was discharged because she failed to contact [E]mployer when she became able to work." UCBR Dec. at 2, FOF 12. Employer's store manager Henry Wolfe (Wolfe) testified as follows:

ET [Employer's representative] Mr. Wolfe, why would—why did the discharge take place on August 4, 2011, if you know?

EW [Wolfe] **Yes, I do. It's because we—*several attempts* that we made to talk to [Claimant] about *positions* that we had or work that we had available for her *went unanswered.* Other than a phone call with her attorney saying that she would not be available for any work with us and to proceed with giving any other communication directly to him.[4]**

ET Okay. And that termination of August 4, 2011, did it include a stipulation that the Claimant could—would not be rehired by [Employer]?

EW Not at all. **We had a position available for her and it's just that we couldn't get a hold of her to give her one.**

. . . .

dence. Claimant does not challenge any of these findings, thus, "they are conclusive on appeal." *Gibson v. Unemployment Comp. Bd. of Review*, 760 A.2d 492, 494 (Pa.Cmwlth. 2000).

---

**3.** Specifically, the UCBR found:

4. The [C]laimant remained under a doctor's care until July 11, 2011.

5. From July 11, 2011, the [C]laimant was able and available for some kind of work.

6. The [C]laimant could have worked in a light duty position for the employer as of July 11, 2011.

. . . .

13. The [C]laimant is able and available for work as of July 11, 2011.

UCBR Dec. at 1–2. All of these findings were based **solely** on Claimant's testimony and evi-

**4.** The UCBR appears to have inadvertently stated "employer's attorney" instead of Claimant's attorney in finding of fact 8. That finding reads: "Then the **employer's** attorney told the employer to not directly contact the claimant." UCBR Dec. at 2 (emphasis added), Majority Op. at 1238.

ET And did [Employer] offer [Claimant] any employment after, according to the Referee's decision, her ability and availability for some kind of work after or as effective July 11, 2011?

EW She certainly could have. She was still employed at that point. So if she was available for work, she could have came [sic] into work. She was still employed with us at her rate—her rate of pay.

ET And what kind of work did you have available for [Claimant] as of July 11th or dates after that?

EW **There were *multiple positions* we had available that we wanted to discuss with her, but our inability to discuss them with her precluded us to [sic] offer her those positions.**

ET Okay. And was that the reason she was separated from [Employer] on August 4, [20]11?

EW It is.

Notes of Testimony (N.T.), March 23, 2012 at 9–10 (double emphasis added).

In addition, the following exchange took place at that same hearing between Claimant's attorney and Wolfe:

CL Do [sic] you ever receive correspondence personally from my office . . .

EW Yes . . .

CL . . . and if you wish to talk to her, you could talk to me?

EW Yes.

CL Then how could you say that you had an inability to speak to her if you talk [sic] to me?

EW Because you wouldn't—because you wouldn't be able to talk to us about her employment? [sic]

CL Why not? I represent her in an employment matter.

EW That has nothing to do with her actual employment with us.

N.T., March 23, 2012 at 13–14.

"The [UCBR's] findings of fact are conclusive if supported by substantial evidence." *Geesey v. Unemployment Comp. Bd. of Review*, 33 Pa.Cmwlth. 376, 381 A.2d 1343, 1344 (1978). "Substantial evidence is evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Umedman v. Unemployment Comp. Bd. of Review*, 52 A.3d 558, 564 (Pa.Cmwlth.2012) (quoting *Wheelock Hatchery, Inc. v. Unemployment Comp. Bd. of Review*, 167 Pa.Cmwlth. 343, 648 A.2d 103, 105 n. 3 (1994)). The law is clear that the UCBR is the ultimate finder of fact, and "questions of credibility and evidentiary weight . . . are matters for the factfinder, [UCBR], not the reviewing court." *Freedom Valley Fed. Savings & Loan Ass'n v. Unemployment Comp. Bd. of Review*, 62 Pa.Cmwlth. 332, 436 A.2d 1054, 1055 (1981). Both findings of fact 7 and 12 are supported by Wolfe's testimony which constitutes substantial evidence and therefore those findings are conclusive.

### Majority's Legal Conclusion

The Majority concluded that "[t]he [UCBR's] findings of fact do not support its legal conclusion that Claimant violated a reasonable expectation of Employer and, accordingly [it] reverse[d]." Majority Op. at 1235. Indeed, on the last page of the opinion the Majority specifies the reasonable expectations as follows:

It was not reasonable for Employer to expect Claimant to convey information already known by, or related to, Employer in her workers' compensation deposition. It was not reasonable for Employer to expect Claimant to disregard her attorney's instructions that he would be the point person in communications with Employer about her workers' com-

pensation. Finally, it was not reasonable for Employer to expect Claimant to report to work on July 12, 2011, as argued by the [UCBR]. Majority Op. at 1243. However, the UCBR never made said legal conclusion. The UCBR correctly defined "willful misconduct as an act of wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior which the employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations to the employer[.]"[5] UCBR Dec. at 2–3. Based on this definition the UCBR concluded: "[E]mployer has met [its] burden [of establishing willful misconduct]. [C]laimant never made [E]mployer aware that she could return to work. Further, [C]laimant did not respond to [E]mployer's offer of work. Finally, [C]laimant's attorney told [E]mployer to no longer contact [C]laimant." Id. at 3. This Court's appellate review is limited to the specific findings challenged on appeal. "Unchallenged findings are conclusive on appeal" and binding on the appellate court. Munski v. Unemployment Comp. Bd. of Review, 29 A.3d 133, 137 (Pa.Cmwlth.2011). Accordingly, this Court's review is restricted to determining whether the two findings of fact Claimant disputes are supported by substantial evidence.

On appeal, Claimant only questioned the UCBR's findings of fact 7 and 12. As thoroughly explained with record citations, those findings of fact are supported by substantial record evidence. Because Claimant did not challenge the remaining twelve findings of fact, they are conclusive as a matter of law. Id.

### Claimant's Argument

Claimant's Argument Section of her Brief is **only** 5 paragraphs, and 1 paragraph is case law and citations. Therein, Claimant contends that the UCBR erred in finding that Claimant was discharged for willful misconduct because

[t]he basis for this holding was the finding of fact that [Claimant] did not contact [Employer] when she became available for work. However, [Claimant] told [Employer's] attorney under oath on July 11, 2011 that she was available for work. This is how [Employer] learned [Claimant] was able to perform some work and contrary to the [UCBR's] finding that she did not contact [Employer] when she was able to work.

Claimant Br. at 9. Notwithstanding Claimant's assertion, the record contains **no evidence** to support Claimant's contention that Employer learned from Claimant's deposition testimony that Claimant could return to work. In fact, the record evidence is to the contrary. Claimant's store manager, who was the individual seeking to contact Claimant about available posi-

---

**5.** The Majority ignores this definition by stating: "The [UCBR's] finding of willful misconduct hinges on whether Employer had a 'reasonable expectation' that Claimant violated." Majority Op. at 1238. This misstatement is compounded by the implication that to meet the burden of proving willful misconduct Employer had to establish that Claimant lied to Employer. See Majority Op. at 1238–39 ("conduct that involves 'a knowing falsehood or misrepresentation to an employer by an employee concerning an employee's work' [is] a disregard of an expected standard of behavior[;]" "[e]xamples of substandard behavior include: lying to a supervisor that a telephone call needed to be made due to an emergency and a misrepresentation on an employment application that the employee had a college degree."). The law in this area is not limited to that specific offense. Rather, the case law is replete with varying circumstances of an employee's disregard of a standard of behavior which the employer has the right to expect.

tions, testified that he was unaware of the WC litigation:

> CL Okay. During the course of 2010 and 2011, were you familiar with [Claimant's WC] Claim?
>
> EW Could you—in which scope?
>
> CL That there was [WC] litigation pending.
>
> EW I was not aware there was litigation. I was aware that she was injured and that she was out on a[sic] Workers' Compensation.

N.T., March 23, 2012 at 13. In addition, **Claimant admitted,** "I had no contact with [Employer] at all because my lawyer said not to." Original Record, Item No. 5, Claimant Oral Interview (Claimant Interview).

Claimant further asserts, in her 4 paragraphs of argument, that her conduct did not rise to the level of willful misconduct. Specifically, Claimant maintains that

> [Employer] was already put on notice to speak with [Claimant's] attorney, not her. . . .
>
> If [Employer] wanted to speak with her after that date, an attempt should have been made through the proper channels. The fact that [Employer] commenced litigation against [Claimant] in her [WC] claim, forcing the parties to speak through attorneys, is not conduct that rises to the level of willful misconduct. . . .

Claimant Br. at 10.

Although Claimant avers that Employer had a duty to follow the **requirement Claimant unilaterally created** of speaking to her only through her attorney, that position is unsupported in fact and law. Employer sought to communicate with Claimant about available positions but received no response "other than a phone call [from] her attorney saying that she would not be available for any work. . . ." N.T., March 23, 2012 at 9. Employer does not have a legal obligation nor does it follow logically that Employer would need to continually or even periodically reach out to Claimant about available work when she already communicated she could not work. How is Employer to know that Claimant can return to work unless Claimant communicates the same to Employer? As this Court in *Homony v. Unemployment Compensation Board of Review,* 11 Pa.Cmwlth. 142, 312 A.2d 77 (1973), held:

> We think that it is the duty of an employee to maintain reasonable communication with [her] employer during a period of prolonged absence. We hold that [the claimant's] failure to contact her employer during her seven-month absence, and particularly during the 40 day period following the termination of her sick benefits, was unreasonable and therefore a breach of the duty she owed her employer. Her conduct therefore, satisfies the above definitions and constitutes 'willful misconduct' under the Unemployment Compensation Act [ (UC Law) [6]].

*Id.* at 78–79. The Majority attempts to distinguish this case based on the fact that Claimant is on WC disability. However, *Homony* is a UC case and Claimant is seeking UC benefits in the instant case. Thus, *Homony* is controlling. Moreover, the law is well-established that "[a]n em**ployer has a right to expect** an employee who is on sick leave to report back to work when cleared to do so by his physician or at least to notify his employer of his reasons for failing to return." *Geesey,* 381 A.2d at 1344 (emphasis added). Thus, an employee's failure to act in this reasonable

**6.** Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §§ 751– 914.

manner in communicating with her employer regarding her ability to return to work constitutes willful misconduct. *Id.*

The Majority recognizes that "the [UCBR] relies upon *Oliver v. Unemployment Compensation Board of Review,* 69 Pa.Cmwlth. 98, 450 A.2d 287 (1982) (holding that claimant committed willful misconduct when she did not return to work at the end of her leave and did not comply with her employer's notification policy)." Majority Op. at 1239. It further notes:

> It has been held that an employer can reasonably expect an employee to return to work after medical leave has ended. In [*Geesey*], this Court held that an employee committed willful misconduct when he did not tell his employer that he had recovered from surgery for which he had been granted medical leave. We reasoned that an employer has the right to expect an employee 'who is on sick leave to report back to work *when cleared to do so by his physician* or at least to notify his employer of his reasons for failing to return.' *Id.* at 1344 (emphasis added).

> This case is distinguishable from *Geesey.* Wolfe acknowledged that Employer had not received 'documentation' from Claimant's 'treating physician' that she could work in any capacity. N.T. 3/23/12 at 14. More to the point, Claimant notified Employer at her deposition why she could not return to her pre-injury job. Finally, Claimant's 'workers' compensation 'leave' did not terminate until September 22, 2011, by which time she had been discharged.

Majority Op. at 1239 n. 8. First, the UCBR does **not** in any manner reference, cite or even mention *Geesey,* so it is unclear why it is footnoted when it supports the UCBR's conclusion. Although the Majority asserts that *Geesey* is distinguishable, such statement is contrary to Claimant's

position and the record evidence herein. For example, the Majority maintains that the WC deposition is notice to the Employer that Claimant could not work, while Claimant maintains her WC deposition is notice that she is able and available to work for purposes of UC benefits. Further, the Majority states that Claimant's WC leave did not terminate until September 22, 2011, yet Claimant declares she was able and available to work as of July 11, 2011. Second, the Majority asserts that *Oliver* is inapposite because here Employer did not have a notification policy. However, once Employer's physician cleared Claimant to return to work and Wolfe contacted Claimant, Claimant became obligated to communicate with Employer. Correspondingly, once Claimant was able to return to work as she testified she was able to do, she was duty-bound to notify Employer. Thus, the distinction raised by the Majority has no impact upon the real issue here, i.e., whether Claimant's failure to notify Employer that she was able and available to work constituted willful misconduct.

Simply because an employer commences WC litigation does not necessitate nor force the employer and claimant to speak through their attorneys concerning claimant's ability to return to work, available positions or job restrictions. This case is not a WC action. The critical facts in this UC litigation are as follows:

1) A claim for UC benefits is premised on Claimant's ability and availability to work. To be eligible to receive UC benefits a claimant must be "able to work and available for suitable work." 43 P.S. § 801(d)(1).

2) The above legal requirement is in stark contrast to Claimant's WC allegation that she is physically unable to return to work and therefore her WC ben-

efits should not be modified, suspended or terminated.[7]

3) Claimant chose not to respond to Employer's telephone calls and letters.

4) Claimant admitted she had no contact with Employer.

5) Claimant through her legal counsel informed Employer that she was unable to work.

6) Wolfe testified that he had no knowledge of Claimant's WC litigation. The only information Employer had at the time of Claimant's employment termination was an unresponsive employee, and a letter and a phone call from her counsel informing Wolfe that "**[Claimant] would not be available for any work.**" N.T., March 23, 2012 at 9 (emphasis added); *see also* Claimant Interview (wherein Claimant admits "I had no contact with [Employer] at all because my lawyer said not to.").

### Deposition Testimony is Not Communication with Employer

Claimant does not cite any case law to substantiate her position that her WC deposition testimony that she was able to work as a food inspector constitutes communication with her Employer that she was able and available to work. The Majority in agreeing with Claimant states "[Claimant] related this information, under oath, in response to the questions posed by Employer's own attorney. . . . It was not reasonable for Employer to expect Claimant to convey information already known by, or related to, Employer in her [WC] deposition." Majority Op. at 1242. The

Majority cites *Eckman v. Erie Insurance Exchange*, 15 Pa. D. & C. 5th 55, 60.(2010), *affirmed*, 21 A.3d 1203 (Pa.Super.2011) ("when a liability insurer retains a lawyer to defend an insured, the insured is considered the lawyer's client.") to support this proposition. However, *Eckman* is inapposite because the court held that once a lawyer is engaged in an attorney-client relationship with the insurer's insured, he is ethically bound to advocate **exclusively** on behalf of the insured client, not the insurance company who hired him. *Id.* The Court in no manner imposed a duty on the insurer's workers' compensation attorney to communicate to employer's personnel the availability of a testifying claimant to return to work nor can any such stretch be made. As this Court has opined, "Claimant's communication with the Employer's insurance representative would not relieve him of the duty to inform Employer of his medical condition." *Washington v. Unemployment Comp. Bd. of Review*, 94 Pa.Cmwlth. 404, 503 A.2d 1055, 1056 n. 3 (1986) (citing *Crawford v. Unemployment Comp. Bd. of Review*, 71 Pa. Cmwlth. 592, 455 A.2d 751 (1983)).[8] Similarly, the California Court of Appeal has held, "ordinarily, a disabled employee may not require an employer to communicate directly with the employee's attorney, because the interactive process contemplates that the employee and employer will communicate directly with each other to exchange information about job skills and job openings." *Claudio v. Regents of Univ. of Cal.*, 134 Cal.App.4th 224, 247, 35 Cal. Rptr.3d 837 (2005).

---

7. Claimant testified at her **July 11, 2011** WC deposition that she was able to work, and is using that date for purposes of showing she was able and available for work to qualify for UC benefits, yet she continued to "collect[ ] total disability [WC] benefits" until September 22, 2011. Majority Op. at 1237.

8. The Majority attempts to distinguish *Washington* and *Crawford* on their facts; however, said distinctions do not change the proposition for which they are cited, i.e., communication with an insurance representative does not constitute communication with an employer.

Moreover, employers are legally mandated to have WC insurance. Included as part of the WC insurance premium is the WC insurance carrier's duty to defend against and represent employers in WC claims. Consequently, WC insurance carriers, not employers, appoint legal counsel to handle the action. Of crucial importance is the fact that the employer has no ability or authority to designate what attorney will represent its organization in the WC action as that determination is at the sole discretion of the WC insurance carrier. In addition, the WC litigation is separate and apart from the employer's daily affairs; an employer's supervisors, managers and often times the human resource managers know nothing about the WC action until the case is closed. Further, this Court has no information as to the length of the WC deposition and the Majority has now imposed a duty on the WC attorney to remember every detail of that deposition to report back to the insurance carrier or the employer. Although a transcript was made of the deposition testimony, such transcript typically takes 3 to 4 weeks to produce which in this case would have been beyond the date of Claimant's employment termination.

To rule that an employee's WC deposition testimony is equivalent to communicating with the employer will have numerous far reaching devastating results. Communication is an essential key to the success of any relationship. To hold that an employee may communicate his ability to return to work to an individual unknown to the employer and who the employer had no influence in selecting to represent its interests undermines the employer-employee relationship. One of the most destructive results of the Majority's holding is that now an employer's WC insurance carrier's attorney, instead of the employee, has the responsibility to communicate with the employer concerning the employee's medical condition immediately upon the conclusion of a deposition, and without the benefit of the transcript from that deposition. Should the WC insurance carrier's attorney fail to communicate the information or present the details inaccurately, the WC insurance carrier's attorney may be liable to the employer and the employee for his inaction or actions. For the reasons stated above, I would conclude that Claimant's WC deposition testimony in the presence of lawyers and a court reporter does not fulfill Claimant's duty to communicate with Employer that Claimant is able and available to return to work.

## Majority's Statements Not Supported by the Record

The Majority makes statements not supported by the record to essentially create its own factual findings to support its conclusion. First, the Majority stated: "Wolfe testified that Employer terminated Claimant because she did not return to work from 'her Workers' Comp leave of absence' after she was cleared to do so by Employer's IME physician in December 2010." Majority Op. at 1237. Wolfe did not so testify.[9] When asked why Claimant was discharged, Wolfe responded:

9. Wolfe's response as quoted by the Majority was in reply to the Referee's question: "[] Wolfe, is that—do you agree with that [Claimant's statement that she did not quit]?" N.T., March 23, 2012 at 5. The Referee followed up: "Okay. So because she did not return, was she discharged?" *Id.* Wolfe responded: Yes, we had made several attempts to contact her to let her know that we had positions available for her and they were intercepted by her attorney. And her attorney

had advised us not to have any direct communication with her and to have all communication sent to him. So she didn't return any of our phone calls or any of our letters that we had let [her] know that we had positions available for her. And due to that reason, we have no—we waited several months after that occurrence before we actually separated her.
*Id.* at 6.

It's because we—*several attempts* that we made to talk to [Claimant] about *positions* that we had or work that we had available for her *went unanswered.* Other than a phone call with her attorney saying that she would not be available for any work with us and to proceed with giving any other communication directly to him.

N.T., March 23, 2012 at 9 (emphasis added). Second, the Majority asserted that when "Counsel asked Wolfe whether Employer had offered Claimant any employment *after* July 11, 2011, . . . [Wolfe] did not answer the question." Majority Op. at 1237. A thorough review of the transcript reveals that Wolfe did respond to the only question similar to that cited by the Majority. That question and answer are as follows:

> ET [Employer Representative] And did [Employer] offer [Claimant] any employment after, according to the Referee's decision, her ability and availability for some kind of work after or as effective July 11, 2011?
>
> EW [Wolfe] She certainly could have. She was still employed at that point. So if she was available for work, she could have came [sic] into work. She was still employed with us at her rate—her rate of pay.
>
> ET And what kind of work did you have available for [Claimant] as of July 11th or dates after that?
>
> EW There were *multiple positions* we had available that we wanted to discuss with her, but our inability to discuss them with her precluded us to [sic] offer her those positions.

N.T., March 23, 2012 at 10 (emphasis added). The dispositive issue is not whether Employer contacted Claimant after July 11, 2011, but whether Claimant notified Employer she was able and available to work as of the day she claimed she could return to work—July 11, 2011.

Third, the Majority opined: "There is no evidence that Employer contacted Claimant about a light duty job after July 11, 2011, as was its duty under the [WC] Act." Majority Op. at 1241. The WC Act is not controlling as this is a UC case. As cited above, our precedent holds that "it is the duty of an employee to maintain reasonable communication with his employer during a period of prolonged absence." *Homony*, 312 A.2d at 78.

The Majority maintains that "there is a disconnect between the [UCBR's] finding that Claimant could do 'some kind of work' on July 11, 2011, and the [UCBR's] conclusion that she 'did not respond to the employer's offer of work.'" Majority Op. at 1240. The Majority further asserts that Employer cannot rely on its physician's clearance because Claimant was not released by her own physician. Although the Majority criticizes Employer for offering Claimant various job opportunities when its physician had cleared Claimant because Claimant's doctor had not yet released her to return to work, the Majority in reversing the UCBR rules that Claimant is eligible to receive UC benefits as of October 9, 2011—**two months before** Claimant's physician released her to return to work.

Lastly, the Majority declares that "[t]he [f]indings of [f]act are not in chronological order. The [UCBR] simply added Findings of Fact No. 6–13 to Findings of Fact No. 1–5 made in the Referee's first decision." Majority Op. at 1239. The Majority infers that this chronology was meant to imply that Employer attempted to contact Claimant after July 11, 2011. I disagree. The UCBR made only 14 findings of fact. None of which misconstrued the facts or the testimony.

The law requires that the findings of fact be supported by substantial evidence, **not that findings of fact be written in a particular order,** especially as in this case, where Claimant's actions did not occur chronologically. Expressly, "[t]he [UCBR]'s findings are conclusive on appeal **so long as the record, taken as a whole,** contains substantial evidence to support those findings." *Hessou v. Unemployment Comp. Bd. of Review,* 942 A.2d 194, 198 (Pa.Cmwlth.2008) (emphasis added). For example, Claimant had a work injury, but asserted she was able and available for work before her treating doctor cleared her to return to work. Further, Claimant applied for UC benefits before being cleared by her treating physician to return to work. Such unique factual findings mandate that fact finders, such as the UCBR, be given latitude to list their findings as they deem appropriate based upon the facts of the particular case.

Moreover, the UCBR is an independent administrative agency charged with upholding and enforcing the UC Law. "[T]he [UCBR] itself has a duty to protect the unemployment compensation fund from ineligible claimants and to investigate all the facts in a given case." *Perminter v. Unemployment Comp. Bd. of Review,* 57 Pa. Cmwlth. 426, 426 A.2d 245, 247 (1981). It is a neutral body which has no reason to distort facts as it is the fact finder. All findings of fact not objected to are conclusive. *Hessou.* What is skeptical is Claimant's argument that while she was litigating her WC action in which she contended she was **not able** to work (which is what her attorney communicated to Employer), Claimant's testimony in the presence of some unknown lawyer that she **could** work is proof to substantiate her UC claim. Even more skeptical is Claimant stating

she was not offered work after July 11, 2011, the date she claims she was able and available to work, despite admitting that she had no contact with Employer making Employer aware that she was able and available to work.

The Majority amplifies this confusion by relying upon the WC Act to decide this UC case, as opposed to the UC Law. Specifically, the Majority states: "The [WC] Act governs the reasonable expectations of an employer with respect to an employee receiving workers' compensation."[10] Majority Op. at 1241. While the WC Act may determine the reasonable expectations of an employer **with respect to workers' compensation,** the UC Law governs the determination as to whether a claimant is eligible to receive UC benefits. Section 401 of the UC Law specifically provides: "Compensation shall be payable to any employe who is or becomes unemployed, and who—. . . (d)(1) [i]s able to work and available for suitable work[.]" 43 P.S. § 801.

While Claimant consistently maintains that she did not need to respond to Employer because her physician did not clear her to work until December 21, 2011, she applied for UC benefits on October 9, 2011, and testified that she was able and available for work as of July 11, 2011. In the meantime, Claimant was discharged from employment on August 4, 2011, and Claimant's WC claim was settled on September 22, 2011. Claimant chose a date **before** her discharge from employment to establish she was allegedly able and available to work (although she admitted she had no contact with Employer), and waited to apply for UC benefits until **after** her WC case settled.

---

**10.** The Majority also stated: "the communication responsibilities of both employer and claimant are a matter governed by the [WC] Act." Majority Op. at 1240 n. 10.

Notwithstanding, the issues Claimant raised to be decided by this Court are whether the UCBR's findings of fact 7 and 12 are supported by substantial record evidence, and if so, whether Claimant's conduct in not notifying Employer that she was able and available for work as of July 11, 2011 constituted willful misconduct. Viewing the testimony in the light most favorable to Employer, as we must, and giving Employer the benefit of any inferences which can logically and reasonably be drawn from the evidence, findings of fact 7 and 12 are supported by substantial evidence and the UCBR correctly determined that Claimant's conduct made her ineligible for UC benefits. *See Big Mountain Imaging v. Unemployment Comp. Bd. of Review*, 48 A.3d 492 (Pa.Cmwlth. 2012). For all the above reasons, I would affirm the UCBR's order.

Judge RENÉE COHN JUBELIRER joins in this dissent.